(No. 29463—

CLARENCE MOERGEN, Defendant in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(THE GLIDDEN COMPANY, Plaintiff in Error.)

*Opinion filed September 18, 1946.*

ANGERSTEIN & ANGERSTEIN, of Chicago, and BUR-ROUGHS, BURROUGHS & BLEISCH, of Edwardsville, (THOM-AS C. ANGERSTEIN, and GEORGE W. ANGERSTEIN, both of Chicago, and GEORGE D. BURROUGHS, of EDWARDSVILLE, of counsel,) for plaintiff in error.

MEYER & MEYER (STANFORD S. MEYER, FOSS D. MEYER, and JOSEPH L. DELAURENTI, of counsel,) all of East St. Louis, for defendant in error.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

Clarence Moergen, defendant in error, filed an application for adjustment of claim with the Industrial Commission, alleging that while employed by the Glidden Company, plaintiff in error, he had become disabled from lead poisoning. The arbitrator found he had sustained a disablement, not as yet permanent, and awarded temporary compensation at the rate of $16.50 per week for a period of 15 weeks. Both Moergen and the company petitioned the Industrial Commission for a review, each being dissatisfied with the decision. The Industrial Commission, after hearing additional evidence, set aside the decision and entered a finding that defendant in error had not sustained a disablement due to an occupational disease contracted in the course of his employment for which compensation was payable. On *certiorari* the circuit court of Madison county reversed and set aside the decision of the commission, holding it to be contrary to the manifest weight of the evidence, and entered judgment, awarding compensation in the sum of $16.50 per week for a period of 95 weeks, as provided in section 19(b) of the Workmen's Occupational Diseases Act, (Ill. Rev. Stat. 1945, chap. 48, par. 172.19,) for the reason that the disablement

had not yet reached a permanent condition at the time of the hearing before the Industrial Commission. The cause is now here on writ of error granted by this court.

Plaintiff in error owns and operates a plant at Collinsville, where it manufactures lithopone, a pigment used in the manufacture of paints, rubber, paper and other materials. Defendant in error was employed at the plant from June 11, 1937, to August 15, 1942, as a helper in the zinc department, where zinc crude materials were dissolved in sulphuric acid and made into a zinc sulphate solution which was used in the manufacture of the lithopone. He worked steadily, losing very little time, until he left his employment on August 15, 1942, by reason of being drafted in the United States Army. On August 2, 1943, he received his discharge and in about two weeks thereafter began working at the shipyards in St. Louis, leaving there after one week because he could not work up high on the ships without becoming dizzy and nervous. About two weeks after he left the shipyards, he obtained employment with the Chevrolet Company and worked there one month. His claim for compensation was filed with the commission on October 6, 1943, a little over a year after he entered the Army and evidently during the time he was working for the Chevrolet Company.

Defendant in error testified that he worked regularly in the zinc department of the Glidden Company until going into the Army; that he handled zinc ore in his work; that he put it in the tanks for processing; that he broke up zinc skimmings with a sledge hammer and threw them into the tanks; that he took the lithopone coming off the filter and put it into pans which he pushed in the oven for drying; that he loaded and unloaded cars, and did other work in the yards. He testified he had yellow jaundice in 1941, but there is no claim or contention that this was in any way connected with, or caused by, his employment. He testified further that he had trouble with his stomach, off

and on, all the time, depending upon what he ate; that too much heavy food, starches and meat, caused him to have stomach cramps; that the doctor sent him to the hospital for X rays, gave him medicine to build up his system, and put him on a diet which he followed for about a month; that this trouble with his stomach continued all the time he was in the Army and after he was discharged and still continues. He testified that while he was in the Army his back bothered him; that he was nervous and his hands would cramp; that each day during his two weeks army basic training, he fell out of the march after going about ten miles; that the marching bothered his legs and they would hurt from the knees down and become stiff following a march. He further testified that there had been no change in his condition since he was discharged from the Army; that he had gotten no better and no worse since he left the employment of the Glidden Company; that it all depends upon what he eats, and that he felt the same when working for the Chevrolet Company as he did when working for plaintiff in error. At the hearing before the commission on June 13, 1944, he testified that the only work he had done since being discharged from the Army, except gardening and a little work around the house, was at the shipyards and for the Chevrolet Company; that every other day he worked a little in the garden, but would become tired and his legs would pain him, requiring him to stop and rest.

Plaintiff in error introduced no evidence before the arbitrator, and defendant in error's evidence consisted of his own testimony and that of E. R. Williams, manager of plaintiff in error's Collinsville plant, W. G. Appleton, a medical technologist, and Drs. James F. McFadden and J. J. Panepinto.

Williams testified that in the zinc department zinc crude materials were dissolved in sulphuric acid and made into zinc sulphate, that the ore used did not contain any lead,

but that some of it would contain lead sulphate and some would not; that the lead sulphate in such crude zinc materials as contained would run between 4 and 5 per cent; that this lead sulphate they just filtered out, that no free lead—which is metallic lead not combined with any other compound—is used at all in the department; that occasionally a car might come in that had lead combined with other compounds, and that the company did not process such ore so as to separate the lead from the lead sulphate.

W. G. Appleton, medical technologist, made blood tests of defendant in error's blood on October 5 and 9, 1943, on October 7, 1943, made a test of his urine, and on October 16, 1943, and December 7, 1943, made examinations of both blood and urine. He testified that in making the blood tests he did a thick drop smear examination and that each examination showed a one plus basophilic punctation; that he did not make a blood count on the first test, but did make a complete blood count on October 9 and 16 and December 7; that on October 9, the hemoglobin was 85 per cent, the white blood count 6600, and the red blood count 3,812,500. On October 16 the hemoglobin was 85 per cent, the white blood count 5700, and the red blood count 4,150,000; and on December 7 the hemoglobin was 87 per cent, the white blood count 7750, and the red blood count 4,137,500. He testified that the normal red blood count is from 4,700,000 to 5,000,000, and the white blood count around 7500. He gave the result of the urine tests as follows: On October 7 he found the lead content of the urine to be 0.253 milligrams per liter, on October 16, 0.1125 milligrams per liter, and on December 7, 0.0757 milligrams per liter. He gave 0.06, in his opinion, as normal, but admitted on cross-examination, that whether from 0.06 to 0.08 is normal was debatable, and that some authorities so hold.

Dr. McFadden examined defendant in error on November 25, 1943, and testified that in his examination he

found defendant in error unsteady when standing with his eyes closed and his feet together; that when he walked he would spread his feet apart and when he walked with his eyes closed he staggered; that the opening between the eyelids was wider on the left than on the right; that in his opinion he had some atrophy of the optic nerve, more marked on the left than on the right; that the reflexes of the upper extremities and the knee reflexes were hyperactive, the left more active than the right; that the vibratory sense was decreased in the lower extremities; and that these conditions indicated permanent damage to defendant in error's nervous system, which could have been caused by lead intoxication or lead poisoning. In answer to a hypothetical question, in which were included the Appleton tests, defendant in error's complaints and his employment and army history, Dr. McFadden stated that in his opinion the damage to defendant in error's nervous system was caused by lead and that there was a causal connection between his condition and his employment.

Dr. Panepinto testified that he had examined and treated defendant in error, that he first examined him on October 22, 1943, and, from that examination, the Appleton tests and defendant in error's complaints and history of his case, he was of the opinion that defendant in error was suffering from lead poisoning and prescribed calcium, which, the witness stated, is a part of the regularly recognized method of treating lead poisoning.

Upon review of the case by the Industrial Commission, the company called as witnesses Dr. O. E. Hagebusch and Dr. Arthur H. Deppe, both of whom had examined defendant in error in December, 1943, and again in April, 1944. Dr. Hagebusch also had made urine and blood examinations and tests on both occasions. He testified that it was his opinion, based upon the examinations and tests he had made, that defendant in error did not have lead poisoning; that the Appleton urinalysis of October 7, 1943,

showing a lead content of 0.253 milligrams per liter was scientifically impossible; that a lead content of such magnitude occurs only after very recent and heavy lead exposure; that lead is excreted in the urine each day and that it was impossible for that much lead to be found in the urine of a person whose last lead exposure was a year previous. Dr. Deppe also testified to the scientific impossibility of the Appleton urinalysis of October 7, 1943, and both Drs. Deppe and Hagebusch testified that the thick drop smear blood test used by Appleton is not, at the present day, regarded as an accurate and scientific method of blood examination. Dr. Deppe testified that defendant in error has a nondisabling diffuse involvement of a minor nature of the central nervous system, and that this condition could not be due to lead poisoning, because if it were, he would have to have a history of lead encephalitis, the symptoms of which are coma, delirium, mania and convulsions. He further testified that defendant in error had full use of his muscles, no paralysis, and that there were no objective findings to substantiate any of his complaints. Defendant in error, when testifying before the arbitrator on January 5, 1944, had stated that he at that time weighed 155 pounds. Dr. Deppe testified that he weighed defendant in error when he examined him on April 21, 1944, and that he then weighed 166½ pounds, that his color was good, and according to his weight, his nutrition was good; and that, although he claimed he could not eat, this gain in weight would indicate that he was getting an adequate diet and digesting his food.

We have repeatedly and recently held in compensation cases, both those arising out of occupational diseases and those arising out of accidental injuries, that the courts are not privileged to disturb the findings of fact of the Industrial Commission unless manifestly against the weight of the evidence, and that where expert medical witnesses disagree, the courts will not undertake to decide where the

preponderance of the evidence lies or which medical experts are more worthy of belief. We have held in such cases that it is the special province of the commission to decide where the weight of the evidence lies, and the court on review will not substitute its judgment for that of the commission unless the decision of the commission is clearly and manifestly contrary to the weight of the evidence. (*Turner* v. *Industrial Com.* 393 Ill. 528; *Cinch Manufacturing Corp.* v. *Industrial Com.* 393 Ill. 131.) The rule that the findings of fact of the Industrial Commission must be allowed to stand unless against the manifest weight of the evidence is just as applicable to findings supporting awards denying compensation as to those which support awards allowing it. (*Clausen* v. *Industrial Com.* 346 Ill. 474.) The sole question, therefore, for our consideration in the present case is whether the decision of the Industrial Commission is against the manifest weight of the evidence; and upon this record, the substance of which is hereinabove set out, it cannot be said that the finding of the Industrial Commission is against the manifest weight of the evidence. The existence or nonexistence of lead poisoning is a scientific question to be determined by professional men, skilled in the practice of medicine and the diagnosing of human ailments. (*American Smelting and Refining Co.* v. *Industrial Com.* 353 Ill. 324.) Here we have the testimony of four doctors. Two were of. the opinion that he was not, and could not be, suffering from lead poisoning. A conflict in the opinion of medical experts regarding the existence of an occupational disease presents a question of fact for the Industrial Commission and in determining such fact the commission is entitled to attach to the respective opinions of the medical experts such weight as it concludes the opinion is entitled to, .in view of all the other facts and circumstances. Where expert medical witnesses disagree the court cannot undertake to determine with technical accuracy where the preponderance of the

evidence lies, but it is the province of the Industrial Commission, qualified by experience and special study, to draw reasonable conclusions and inferences from the evidence, and its decision in such case should not be set aside unless manifestly against the weight of the evidence. (*J. I. Case Co.* v. *Industrial Com.* 378 Ill. 132; *Hansell-Elcock Co.* v. *Industrial Com.* 376 Ill. 151.) From the record here, we hardly see how it could reasonably be said the findings of the Industrial Commission are against the manifest weight of the evidence. The circuit court, therefore, erred in setting the same aside.

The judgment of the circuit court is reversed and the cause is remanded, with directions to enter judgment confirming the decision of the Industrial Commission.

*Reversed and remanded, with directions.*